Everett HADIX, et al., Plaintiffs,

v.

Perry M. JOHNSON, et al., Defendants.

Civ. A. No. 80–73581.

United States District Court,
E.D. Michigan,
Southern Division.

March 14, 1995.

Michael J. Barnhart, Detroit, MI, for plaintiffs.

David G. Edick, Kim G. Harris, Asst. Mich. Attys. Gen., Lansing, MI, for defendants.

## OPINION

FEIKENS, District Judge.

### I. INTRODUCTION

The case of *Mary Glover, et al. v. Perry Johnson, et al.*, Civil Action No. 77–71229 (ultimately a class action), began on May 19, 1977. The case of *Everett Hadix, et al. v. Perry Johnson, et al.*, as captioned above (ultimately a class action), began on September 18, 1980.

In all of the years since these cases were filed until now, the parties have sought this court's active involvement. *See Glover v. Johnson:* 478 F.Supp. 1075 (E.D.Mich.1979); 510 F.Supp. 1019 (E.D.Mich.1981); 855 F.2d 277 (6th Cir.1988); 721 F.Supp. 808 (E.D.Mich.1989); and 934 F.2d 703 (6th Cir. 1991). *See Hadix v. Johnson:* 694 F.Supp. 259 (E.D.Mich.1988); *aff'd,* 871 F.2d 1087 (6th Cir.1989); 712 F.Supp. 550 (E.D.Mich. 1989); *aff'd in part and rev'd in part, vacated, in part, remanded, sub nom., Knop v. Johnson,* 977 F.2d 996 (6th Cir.1992); *cert. denied, Knop v. McGinnis,* —— U.S. ——, 113 S.Ct. 1415, 122 L.Ed.2d 786 (1993).

The key result of the several actions in *Glover*, both at the level of this court's involvement and in the U.S. Court of Appeals for the Sixth Circuit, was a 1981 Final Order stemming from a negotiated settlement between the parties and a resultant Remedial Plan dated December 6, 1991. *See Glover*, 934 F.2d at 708. On a parallel track, the various actions outlined in *Hadix* culminated in an Order, filed May 13, 1985, accepting the Consent Judgment (the "*Hadix* Consent Decree" or the "Decree," filed February 13, 1985). An Out-of-Cell Activity Plan (or the "plan"), dated November 9, 1985, was submitted to the court as required under the Consent Decree.

This common introduction to these two cases results from parallel actions initiated by defendant Michigan Department of Corrections (or "Department of Corrections") to modify the Remedial Plan and the Plan for Vocational Programs and Work Pass, in *Glover*, and the 1985 Out-of-Cell Activity Plan mandated by the *Hadix* Consent Decree, in *Hadix*.

While in their motion to modify the Out-of-Cell Activity Provision of the Consent Decree in *Hadix*, defendants rely on *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), defendants in *Glover* apply the *Rufo* principles in seeking modification of the Remedial Plan. Before discussing and deciding the respective motions filed in these two cases, it is important to point out the lengthy and arduous work which these cases have required in order to secure compliance with the Consent Decree and the Out-of-Cell Activity Plan in *Hadix*, and the negotiated settlement and Remedial Plan in *Glover*. Even now, after years of attempted compliance, the parties are at odds as to whether the goals have been achieved.

It may be indigenous to the nature of this litigation that it is seemingly endless. For example, with the exception of Michael Barnhart, counsel now for both plaintiff classes, all of the numerous attorneys who have represented the plaintiff classes or have been on the staff of the Attorney General are no longer in the cases. The office of Director of the Department of Corrections has had a number of individuals, beginning with Perry Johnson, and now Kenneth McGinnis. The population of the prisons is under constant change and, thus, the inmates who arrive at the prison facilities and are represented in both class actions are unacquainted with the past history of these cases, and see their confinement problems as new matters. Finality, in these cases is, accordingly, elusive—even though it is highly desired.

What is striking, too, is the argument that is now marshalled in favor of modification. Curiously, defendant Department of Corrections has argued that public opinion with regard to the "rights" of prisoners has changed.

This court is necessarily concerned with the status of compliance with the various orders, plans, the negotiated settlement and Consent Decree mandates, should this court's involvement be terminated.

These are matters that are at the nerve center of these motions seeking modifications and termination; and they must be dealt with, if possible, in each of the respective opinions and decisions.

Before me is Defendants' Motion Seeking Modification of the 1985 Out-of-Cell Activity Provision of the *Hadix* Consent Decree pursuant to Fed.R.Civ.P. 60(b)(5) and (6).[1]

---

1. This motion is in response to the remand by the U.S. Court of Appeals for the Sixth Circuit of defendants' appeal of my May 10, 1990 Order. In addition to enjoining defendants from canceling, abridging and/or impeding post-secondary education programs offered by Jackson Community College for prisoners subject to the *Hadix* Consent Decree, the May 10, 1990 Order denied Defendants' Motion to Modify or Vacate the State Plan for Out-of-Cell Activity. The court of appeals remanded defendants' motion to modify for reconsideration, in light of the U.S. Supreme Court decision in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Defendants subsequently filed a motion to modify the entire Out-of-Cell Activity Plan of the *Hadix* Consent Decree. Oral argument was heard and evidence was taken on defendants' motion during a series of hearings held on June 28, August 2, October 27, and November 10, 1994. These hearings followed an intensive period of negotiations which were not successful.

## II.  BACKGROUND

In 1980, a class of inmates housed at the State Prison of Southern Michigan–Central Complex ("SPSM–CC" or Central Complex) filed a complaint, under 42 U.S.C.A. § 1983, alleging that their constitutional rights had been violated.  Five years after the complaint was filed, the parties agreed to the entry of a Consent Decree.  The scope of the Decree was defined in one of the introductory paragraphs: "The provisions contained herein are intended by the parties to assure the constitutionality of the conditions under which prisoners are incarcerated at SPSM–CC." (*Hadix* Consent Decree at ¶ 3.)  Section IV.H.2 of the Decree required the development and implementation of a plan concerning out-of-cell activity for prisoners.  Specifically, the provision required:

> Within 180 days from the entry of the Judgment in this matter, the Department will submit a plan which will provide for meaningful out-of-cell activity.  It is recognized that no particular activity is itself required.  *The objective of the plan is to provide meaningful activity outside of cells including access to general and law libraries, education, industrial or other work activity, religious activity, other group activities, etc.*  For the activities to be provided, there shall be reasonably adequate staffing, facilities, and equipment.  The plan shall provide access to these various activities such that at the facility 75% of all inmates may be active out of their cells, including exercise, meal, shower, and law library time no fewer than seven hours daily on weekdays and five hours daily on weekends.  The plan shall provide for full and continuing implementation within an additional 180 days after its approval or adoption.

(*Hadix* Consent Decree at 26.)  (Emphasis added.)  In November 1985, defendants submitted an Out-of-Cell Activity Plan to which plaintiffs did not object.  Defendants now seek to modify that plan by substitution of an alternative plan.[2]  Because I conclude that there has been no significant factual or legal change to warrant modification, defendants' motion is denied.

## III.  RUFO ANALYSIS

### A.  In General.

■ Federal Rule of Civil Procedure 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgment should have prospective application."  Fed.R.Civ.P. 60(b)(6) provides that a party may obtain relief from a court order for "any other reason justifying relief from the operation of judgment."  In *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Supreme Court adopted a test for district courts to utilize when considering requests to modify, pursuant to Fed.R.Civ.P. 60(b), consent decrees stemming from institutional reform litigation.  Under the *Rufo* test, defendants, as the party seeking modification of the Consent Decree, bear the burden of establishing that a significant change in circumstances warrants revision of the Decree.  If defendants meet this standard, the court will consider whether defendants' proposed modification is suitably tailored to the changed circumstances.  *Id.* at 383, 112 S.Ct. at 759–60.

■ Defendants may meet their initial burden by showing a significant change in either factual conditions or in the law which makes compliance with the Decree substantially more onerous.  *Id.* at 384, 112 S.Ct. at 760.  Modification of the Decree is also appropriate if defendants show that the Decree is unworkable because of unforeseen obsta-

---

**2.**  In their appeal, *supra* note 1, defendants argued that the nature and enforceability of the Out-of-Cell Activity Plan is questionable.  Defendants claim that the plan that was submitted was intended to demonstrate compliance with Section IV.H.2 of the *Hadix* Consent Decree, and was not intended to specifically bind defendants to any particular program.

However, the Consent Decree specifically provides that "the [out-of-cell activity] plan shall be appended to the judgment in this matter" where plaintiffs have no objection.  (*Hadix* Consent Decree at 33.)  Additionally, in my August 23, 1990 Opinion, I found that the Out-of-Cell Activity Plan submitted was the plan required by Section IV.H.2 of the Consent Decree;  that the plan is not simply a compliance report;  that the specific provisions of the plan are enforceable;  and that the plan became part of the Consent Judgment.

cles or when enforcement of the Decree without modification would be detrimental to the public interest. *Id.* Modification is not appropriate, however, where defendants simply rely upon events that actually were anticipated at the time they entered into the Decree. *Id.* at 385, 112 S.Ct. at 760–61. If it is clear that defendants anticipated changing conditions that would make performance of the Decree more onerous but nevertheless agreed to the Decree, defendants must satisfy a heavy burden to convince the court that it agreed to the Decree in good faith, and made a reasonable effort to comply with the Decree, before they would be relieved of the undertaking under Rule 60(b)(5). *Id.*

## B. The Out-of-Cell Activity Plan and Defendants' Basis for Modification.

The purpose of the Out-of-Cell Activity Plan is to make it certain that over seventy-five percent (75%) of the prisoners residing at the Central Complex of the State Prison of Southern Michigan have the opportunity to participate in meaningful out-of-cell activities at least seven (7) hours daily on weekdays and five (5) hours daily on weekends. (*Hadix* Consent Decree, *supra.*) The activities range from such basic ones as meals, showers, and yard accessibility, to work, college and vocational programming, general and law library access, family visits and religious and leisure activities.

Defendants cite various changes which they believe make the current provisions of the Out-of-Cell Activity Plan unworkable and "contrary to public interest."[3] The changes can be classified into four areas: (1) factual changes; (2) physical and operational changes pursuant to Section VIII of the Consent Decree and planned and implemented by defendants; (3) a marked improvement in the levels of violence; and (4) the remedying of overcrowding.

### 1. Factual changes.

Defendants point to several facts which the court will, for the purpose of this motion, assume have changed. However, defendants have not shown how the various factual changes make compliance with the Consent Decree substantially more onerous or unworkable. . Defendants point out that: (a) the demand for Michigan State Industries products has changed; (b) level 5 inmates are present; (c) lack of interest (on the part of inmates) and shorter periods of time (prisoner turnover) prevent attainment of the academic and vocational percentages outlined in the Decree; and (d) public opinion has changed.

### (a) The demand for Michigan State Industries products has changed.

Defendants believe that the decrease in the demand for industries products is sufficient to relieve them of the inmate work requirement under the plan. The decrease in demand, according to defendants, is caused by a number of factors including a decrease in public interest in the products and a restructuring of the industry by the state legislature. The industry is now an independent business rather than a subsidized governmental entity. Thus, defendants have had to adjust the workforce due to a decline in profit.

The plan requires that not less than 54% of the prisoners be assigned work. (Central Complex Out-of-Cell Activity Plan at 1.) In 1994 a 49% level was reached at Central Complex alone.[4] (Defs. Exh. 2.) Defendants thus reached 91% of the target percentage. Although the decrease in the demand for industries products, along with the restructuring of the industry, has had some effect, it has not made compliance with the plan "substantially more onerous" as required by

---

3. In place of the current plan, defendants propose a modified out-of-cell activity plan which they believe effectively balances this court's constitutional concerns with the needs of the Department of Corrections to effectively administer this state's correctional population. Because none of the changes advanced by defendants warrant modification of the plan under *Rufo*, an analysis of defendants' proposal is not necessary.

4. The percentage of inmates participating in assigned work at Egeler was 66% in June of 1994. (Defs.' Exh. 2.) In 1988, the Egeler Facility which was previously included as a part of Central Complex was separately named. Subsequently, defendants began separate reporting for Egeler.

*Rufo, supra.* In fact, defendants have almost reached 100% compliance. Although the percentages in this area may need to be revisited if the demand for industries products continues to decline, defendants' request for modification at this juncture is premature.

#### (b) *Level 5 inmates are present.*

■ Defendants also argue that the presence of level 5 inmates is a factual change which makes compliance with the Decree substantially more onerous or unworkable. According to defendants, the limitations associated with level 5 activities have changed. Under the Decree, the increased presence of level 5 inmates in the general population does not affect defendants' ability to reach the required proportion of inmates participating in out-of-cell activity.[5] Thus, although the presence of level 5 inmates may be a factual change, it does not affect defendants' ability to comply with the current Out-of-Cell Activity Plan.

#### (c) *Lack of interest (on the part of inmates) and shorter periods of time (prisoner turnover) prevent attainment of the academic and vocational percentages outlined in the Decree.*

■ Defendants argue that there is a lack of interest (on the part of inmates) for academic and vocational activities which prevents attainment of the percentages outlined in the plan. However, defendants' exhibit 23 reveals that there was a waiting list for academic programming at both the Central Complex and Egeler facilities in 1994. According to defendants, it would be in the best interest of the inmates to have General Equivalency Degree ("GED") and other remedial programming instead of college programming because many inmates are functionally illiterate.

Under the Out-of-Cell Activity Plan 14% of the inmates population must participate in academic and vocational activity. (Central Complex Out-of-Cell Activity Plan at 1.) In 1994 defendants reached 12% for Central Complex alone.[6] (Defs' Exh. 2.) Thus defendants attained 86% of the requirement. If defendants were able to accommodate the inmates on waiting lists they would have reached, more likely than not, the percentage targets. Although there may be an increased need for remedial-type academic programming, the facts do not indicate that compliance with the Decree, as relates to college and vocational programming, is substantially more onerous because of this increase.[7]

Additionally, defendants argue that shorter periods of time and high prisoner turnover prevent attainment of the academic and vocational percentages outlined in the plan because inmates cannot continue college programming if they are transferred to a nonconsent Decree facility. The requirement

---

5. An increased presence of level 5 inmates in administrative segregation, however, could affect defendants' ability to comply with the 75% out-of-cell participation requirement if the number of inmates in the general population remained constant or decreased as the number of inmates in administrative segregation increased. In June of 1994 the number of inmates in administrative segregation was 156 out of a total population of 1,554, or 10%. (Defs.' Exh. 40). Thus, the increase in level 5 inmates, assuming this increase directly increases the number of inmates in administrative segregation, does not affect defendants' ability to reach the 75% requirement.

6. The Egeler facility reached a level of 11% in 1994. (Defs.' Exh. 2.) *See supra,* note 4.

7. Defendants' arguments and proposed modification, as related to college programming, aim to delete such programming altogether. However, defendants contracted in the Consent Decree, and through the Out-of-Cell Activity Plan, to provide college programming to qualified inmates in the Central Complex. I note that defendants are not opposed to the idea of this type of academic training. They have indicated that they would have no objection to a continued offering of college programming if this was not financed with state taxpayer funds. I note too, that, in the breakup plan, the new facilities are so constructed that classroom and distance education can be provided to inmates. With this in mind, I direct that the parties explore ways and means in which distance education can be provided to the inmates. Either the public universities or private colleges can form a consortium and, with the aid of seed money of one or more interested Michigan foundations, such a program may be begun. Ways and means can also be explored to see if there are available funds for the continuation of such a program through the Inmate Benefit Fund.

looks at enrollment at any one particular time, not completion or attainment of a degree. More important, there is no proof that increased turnover has had any effect on the ability of defendants to reach the required percentages. The evidence presented by defendants indicates that they had reached 86% of the target in 1994. Because there was a significant number of prisoners on waiting lists for academic and vocational programming, it is clear that once defendants make arrangements to accommodate those inmates on waiting lists, they will have no problem gaining the additional two percentage points required.

### (d) *Public opinion has changed.*

■ Finally, defendants argue that the change in public opinion is a factual change which warrants modification of the Out-of-Cell Provision of the Decree. Specifically, defendants point out that the sentiment of the public is against college programming for prison inmates. Defendants contend that it is the desire of the public that its prisons discontinue providing college programming for prisoners. According to defendants, enforcement of the Decree is contrary to the public interest under *Rufo.*

Defendants have misinterpreted *Rufo* on this point. A decree is detrimental to the public interest when there is an increased risk of harm to the public if the decree is enforced. The Supreme Court cited *Duran v. Elrod,* 760 F.2d 756 (7th Cir.1985), as an example of this test. In *Duran,* modification was allowed to avoid pretrial release of accused violent felons. *Id.* at 756–761. Defendants have not pointed to any increased risk of harm to the public if college programming is continued in spite of the public sentiment. In fact, numerous studies reveal that prisoners who receive college programming are less likely to commit crimes upon release. A change in public opinion does not mean that the continuation of college programming is detrimental to the public interest and does not warrant modification of the Consent Decree under *Rufo.*

### 2. *Physical and operational changes pursuant to Section VIII of the Consent Decree and planned and implemented by defendants.*

■ Section VIII of the Consent Decree requires the development and implementation of a Management Plan for SPSM which, as developed, calls for the decentralization of SPSM into four facilities that are substantially autonomous. The requirement for this plan was included in the original *Hadix* Consent Decree. The plan is substantially developed and is under implementation.

Defendants assert that the implementation of the breakup of the SPSM complex, including the *Hadix* facilities, into four separate facilities, constitutes a change that warrants modification of the Out-of-Cell Activity Plan.[8] Defendants argue that the breakup will make compliance with the plan more difficult because of changes in demographics and changes in the physical structure during the breakup *only.* Upon completion, however, defendants acknowledge that there will be no hindrance. According to defendants, the process of the breakup is preventing complete compliance with the plan and there will be even less compliance in the future. However, at the current time, defendants have no problem complying with the 75% requirement of the plan and are currently at 12% of the 14% academic and vocational requirement for the Central Complex.[9]

Defendants also cite certain changes that they implemented in order to improve the management and operation of SPSM and other facilities. Examples include the reorganization (McGinnis Aff. at ¶ 4.B.), the con-

---

**8.** Defendants also introduce the notion that the facilities resulting from the implementation of Section VIII of the Decree are not subject to the jurisdiction of the *Hadix* Consent Decree. However, defendants are obligated to implement all sections of the Consent Decree, including Section VIII, until, pursuant to Section XII of the Decree, the court terminates jurisdiction. Furthermore, I previously ordered, in the Order accepting Consent Judgment (dated May 13, 1985), that physi-

cal or operational modification of the facilities located within the walls of SPSM does not affect the jurisdiction of this court, especially when the process of modification was anticipated by and conducted under the jurisdiction of the court.

**9.** Testimony of Defendant Director Kenneth McGinnis (cross examination) Aug. 2, 1994.

struction of new facilities (McGinnis Aff. at ¶ 7.), and the implementation of a new movement schedule and related operational reorganizations (Jabe Aff. at ¶ 8.). However, these changes should make ongoing compliance with the plan less onerous and more workable, and therefore they do not provide a justification for modification under *Rufo*. Furthermore, since the changes were planned and implemented by defendants, they cannot now claim that their own actions create unforeseen circumstances.

### 3. *Improvement in levels of violence.*

■ Defendants allege that the levels of violence have decreased since 1985 and that this is an indication that the facilities are better managed and under control. Defendants cite various changes in conditions of confinement including a reduction in the mixing of prisoners with incompatible security classifications, and a decline in the number of major misconduct hearings. As a result of these changes, defendants conclude that there is no longer a need for the plan.

To meet the *Rufo* standard, defendants must show that the changes make compliance with the Decree substantially more onerous, or unworkable, or detrimental to the public interest. Defendants have failed to establish that the changes, as they occur, make compliance with the Decree substantially more onerous, or unworkable, or detrimental to the public interest. In any event, the decrease in violence levels does not affect defendants' ability to comply with the current Out-of-Cell Activity Plan. If anything, the changes facilitate compliance with the requirements of the plan.

### 4. *The remedying of overcrowding.*

■ While defendants do not clearly state their case on this point, I construe part of the defendants' claim to be that it would be detrimental to the public interest to continue to mandate implementation of the Out-of-Cell Activity Plan, if the conditions that the plan was intended to alleviate have been remedied. Defendants claim that the Out-of-Cell Activity Provision was intended to assure "the protection from harm and/or adverse impact from overcrowding." They cite,

as proof, the fact that the title of the section of the Consent Decree under which the provision appears is "IV. Overcrowding and Protection from Harm". (*Hadix* Consent Decree at 23–26.)

Since there was an extrinsic purpose in the plan to improve certain conditions, and some of those conditions are actually improving as the plan is being implemented, it would be perverse to modify the plan simply because it contributed to improving the very conditions that it was intended to improve. Furthermore, there is no linkage in the language of the Consent Decree that defendants claim. Section IV contains a wide range of provisions, some of which are related to the prevention of potential future crowding, such as provisions to continue single celling. Other provisions relate to the mitigation of other types of harm. The purpose of the Out-of-Cell Activity Plan was not to remedy overcrowding; the requirement of continued single celling solved this problem. Thus, the remedying of overcrowding is not a factual or legal change which makes compliance with the Decree substantially more onerous as required under *Rufo, supra.*

### IV. *ORDER FOR MODIFICATION OF CERTAIN SPECIFIC REQUIREMENTS*

■ Defendants McGinnis and Jabe testified that defendants could no longer comply with certain elements of the Out-of-Cell Activity Plan; that they were out of compliance with certain provisions; and that modification was therefore warranted. They cited conditions such as the closing of certain cellblocks due to implementation of the Management Plan, *supra,* and changes in schedules for certain programs and services as reasons for noncompliance.

I am persuaded that certain elements of the Out-of-Cell Activity Plan need to be modified because they were written with specificity that no longer applies to current circumstances. The appropriate approach is to relieve the defendants of the obligation to comply with certain specific requirements altogether. I therefore order the following modifications to the Out-of-Cell Activity Plan:

1. Defendants shall not be required, pursuant to the Out-of-Cell Activity Plan, to maintain a capacity for 2,340 prisoners in the *Hadix* facilities.

2. Defendants shall not be required to maintain a specific proportion of capacity for administrative segregation, protective custody, or punitive segregation.

3. The categories of prisoners identified in the second and third paragraphs of the Out-of-Cell Activity Plan, including prisoners in administrative segregation, punitive segregation, protective custody, the hospital, reception, and prisoners who are temporarily confined, may exceed 25% of the population of *Hadix* facilities. The provisions of the Out-of-Cell Activity Plan shall continue to apply to the remaining prisoners.

4. Defendants may substitute other comparable groups for the Special Activities groups named in paragraph 10 of the plan.

5. In paragraphs 11 and 14, the plan refers to specific numbers of hours of activities associated with specific yards. Defendants may modify yard assignments and schedules consistent with the remaining provisions of the Consent Decree and the Out-of-Cell Activity Plan.

6. All references to "Central Complex" in the Plan shall be changed to "Facilities subject to the Hadix Decree."

7. Schedules provided in the plan as Appendices 1 and 2 are hereby deleted from the plan.

8. For any provision of the plan involving a numerical measure of compliance, defendants may demonstrate compliance for each *Hadix* facility separately, or for all *Hadix* facilities considered in combination.

## V. *CONCLUSION*

Defendants have pointed to a number of changes which they believe warrant modification of the Out-of-Cell Activity Plan incorporated into the *Hadix* Consent Decree. None of the changes alleged by defendants warrant modification. Thus, defendants' motion is denied. Additionally, because some specific requirements of the Decree are no longer applicable, I order that certain specific requirements of the Decree be modified as discussed in Section IV, *supra*.

## VI. *FINALITY IN THESE PROCEEDINGS*

As has been indicated, both *Hadix v. Johnson* and *Glover v. Johnson* have been before this court for many years. Defendant Department of Corrections has frequently raised the question of finality in these proceedings. There must come a time when the involvement of the court is no longer either required or necessary. The plaintiff class in each case argues that until the conditions that brought these cases to this federal court initially have been corrected, there is no basis for the contention of finality. The issue is complicated additionally by the argument that, in this case, the parties entered into a Consent Judgment which cannot be modified or terminated unless the requirements of *Rufo* are met.

Nonetheless the matter of finality must be addressed. Where, as in these cases, the parties (inmates versus Department of Corrections) are in a continuing relationship, the concept of finality becomes even more complicated.

For example, it would be an exercise in futility for me to hold that finality has been attained, only to have a group of plaintiff inmates begin a new case, citing the allegations of constitutional violations. The perplexing issue is: **How is finality reached in these public agency-public law cases?** Arguably, permanent involvement by a federal court in the work of a state agency such as the Department of Corrections is not desirable and, at some point, unwarranted.

As it is so often a need in the administration of justice, a balance must be reached. That balance is reached, it seems, when there is substantial compliance with the goals of either a consent judgment, as in *Hadix*, or a negotiated settlement, as in *Glover*. As the analysis of these factors has been made in each of these cases, as indicated in the foregoing Opinion, that requirement of compliance has not yet completely been reached. That fact may not be used, however, to avoid addressing finality. Even though progress

has been slow in both cases, there has been substantial progress toward finality.

It is this court's view that a further test period is still required. That test period can be measured in a discrete time frame.[10]

This court, with the aid of its Monitors, will determine within a period of sixty (60) days after December 31, 1996, whether compliance has been substantially accomplished. During the period prior to December 31, 1996, each of the monitors will perform quarterly reviews which will be submitted to the court and the parties detailing the compliance status in each program in each case. In making this judgment and adopting this approach, I have followed the teaching of *U.S. v. State of Mich.*, 18 F.3d 348 (6th Cir.1994). The procedure for the determination of finality, as outlined in that case, is a method for reaching a balance in these cases.

The plaintiff class may submit a proposed order.

---

**10.** This approach has already been endorsed by Defendant Director McGinnis. (Letter from Director McGinnis to the court of 2/15/95.)