James BENJAMIN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM,
et al., Defendants.

Ernesto MALDONADO, et al., Plaintiffs,

v.

William CIUROS, Jr., et al., Defendants.

DETAINEES OF the BROOKLYN
HOUSE OF DETENTION FOR
MEN, et al., Plaintiffs,

v.

Benjamin J. MALCOLM,
et al., Defendants.

DETAINEES OF the QUEENS HOUSE
OF DETENTION FOR MEN, et al.,
Plaintiffs,

v.

Benjamin J. MALCOLM,
et al., Defendants.

Iola FORTS, et al., Plaintiffs,

v.

Benjamin J. MALCOLM,
et al., Defendants.

Guy Zepth AMBROSE, et al., Plaintiffs,

v.

Benjamin J. MALCOLM,
et al., Defendants.

Nos. 75 Civ. 3073(MEL), 76 Civ. 2854(MEL), 79 Civ. 4913(MEL), 79 Civ. 4914(MEL), 76 Civ. 101(MEL), and 76 Civ. 190(MEL).

United States District Court,
S.D. New York.

July 22, 1994.

Phillip L. Weinstein, John Boston, Lisa A. Freeman, Marta Nelson, The Legal Aid Society, Prisoners' Rights Project, New York City, for plaintiffs.

Paul A. Crotty, Corp. Counsel, New York City (Leonard Koerner, Paul Rephen, Asst. Corp. Counsel, of counsel), for defendants.

LASKER, District Judge.

In 1979, this and other courts entered consent decrees (collectively "the decree") settling plaintiffs' claims that conditions of confinement for pre-trial detainees in the New York City jails were unconstitutional. By consent, these cases were then consolidated before this Court for enforcement purposes. In 1982, a further consent order was entered creating the Office of Compliance Consultants (OCC), a neutral third party intended to assist the defendants in attaining compliance.

The decree, *inter alia*, contains detailed provisions regarding the provision of food services to members of the plaintiff classes. In 1991, the City decided on the "cook/chill" method of food preparation—by which food is prepared in advance at a production center, chilled, transported, and reheated at the point of service—to meet the food service requirements of the decree. To implement this decision and to expedite compliance with the requirements of the decree, the Court directed OCC to prepare a Food Service Work Plan, identifying the tasks required to be done to bring the defendants into compliance and setting schedules for the accomplishment of each task.

In June 1991, the Court adopted the first Food Service Work Plan and entered it as an Order. After the defendants failed to carry out the terms of this Work Plan, it was revised to add new dates and steps agreed upon by the parties, and the Court entered a Revised Food Service Work Plan as an Order on July 10, 1992 (The "1992 Food Service Order"). The same day, frustrated by the pattern of continued noncompliance, the Court entered its Order: Re Compliance with Work Plan Deadlines (the "1992 Compliance Order"), which created a schedule of coercive fines for failures to adhere to the requirements of the work plan.

The 1992 Food Service Order required the defendants to make a decision by November 1, 1993 as to the means by which they would provide cook/chill food—either by contracting with a vendor or by building its own cook/chill production center. On that date, the City notified OCC of its decision to provide food to inmates by purchasing cook/chill food from a facility located in Orangeburg, New York on the grounds of the Rockland Psychiatric Center, owned by the State Office of Mental Health (the "Rockland County facility").

The Rockland County facility offered a number of advantages compared to other options the City had considered. First, the Rockland County plan represented a major budget saving because it required by far the smallest capital investment by the City—the cook/chill facility to be utilized already existed and merely had to be expanded to accommodate the City's needs. Moreover, since the facility did already exist, the Rockland County plan could also be implemented more quickly than other plans, not least because OMH's staff had considerable experience at providing food services.

On January 1, 1994, the present City administration took office and shortly thereafter began a review of the cook/chill program. Peter Powers, the Deputy Mayor for Operations of New York City, was informed that, although the previous administration had considered the immediate budget impact of the Rockland County plan on New York City, it had not performed an overall economic impact analysis, taking into account such factors as loss of jobs and increased welfare costs occasioned by purchasing the food outside the City, rather than producing it within the City itself.

At Mr. Powers' request, such an economic impact analysis was undertaken by the New York City Economic Policy and Marketing Group, an agency responsible for the analysis of the City's economic development programs. The study concluded that the net fiscal impact of the various cook/chill options was roughly comparable, but that locating the facility within New York City offered the advantage of creating at least 283 permanent local jobs. (Aff. of James Parrott, Chief Economist for the Economic Policy and Marketing Group, ¶ 7). On March 18, 1994, on the basis of this analysis, the City decided unilaterally to abandon the Rockland County plan in favor of securing cook/chill food within New York City. The decision was made without Court approval, or even a request for Court approval and violated the 1992 Food Service Order.

Throughout the period in question, that is, from the summer of 1993 until the City's decision in March 1994, a number of State legislators representing New York City districts had importuned the City to keep the cook/chill operation in New York City. For example, on December 15, 1993, eight State legislators wrote a letter to the outgoing mayor, urging the City not to consummate the Rockland County plan and pointing out that the "state appropriation for costs associated with modifying the existing OMH facili-

ty to accommodate [the City's] needs ... cannot be assumed until final adoption of the State budget in April, 1994." State Senator Guy Valela from the Bronx had already come to Mr. Powers to discuss the job impact of the Rockland County plan around the time of the election, in November 1993. Later, in February 1994, Mr. Powers also met with State Senator Gonzalez and the Speaker of the Assembly, Sheldon Silver, to hear their concerns.

As a result of these pressures, the State Budget Director, Rudy Runcko, wrote to the City Budget director, Abraham Lackman, on March 9, 1994 to ascertain whether the City was still willing to proceed with the Rockland County plan. The letter stated:

> Over the last few months, members of the New York State Legislature representing New York City districts, have criticized the [Rockland County] proposal as damaging to the City's economy.... In response to these concerns, the State has pointed out that the decision to proceed with this agreement lies with the City, which is in the best position to weigh the benefits of the contract with any impact it might have on the City economy. The State does not want to do anything here that would injure the City's economy or fiscal situation.

> To dispel any misunderstanding of the State's position in this matter, I have instructed the State's negotiators to cease discussion of the contract with the City until the State Legislature has had an opportunity to act on the proposed appropriations needed to implement the agreement; and further until we have a formal policy affirmation from the City that it has reviewed the cost benefit factors related to this agreement and still wishes to proceed with the use of the Rockland site.

> I would appreciate knowing the official City position on this contract.

Although this letter clearly left to the City the decision as to whether to proceed with the Rockland plan, and specifically solicited a statement of "the official City position on this contract," the City nonetheless never responded to it. The City's inaction effectively abandoned the Rockland County project to its critics in the State legislature and, as a result, the final budget, signed by Governor Cuomo on March 31, 1994, contained a provision specifically excluding New York City from a list of entities with which the State's Office of Mental Health could contract for cook/chill services provided at the Rockland County facility.

On the same day, the City formally informed the Court that it had decided to abandon the Rockland County plan in favor of a New York City facility. The Court instructed the City that the City had no authority to make a unilateral decision without Court approval and that it would not consider approving the change of plans without a formal motion. The City has now moved for an Order permitting it to modify its obligation to use the Rockland County production center under the 1992 Food Service Order. The plaintiffs have cross-moved for sanctions and to hold the City in contempt for violation of the decree and the Order.

## I.

Rule 60(b)(5) of the Federal Rules of Civil Procedure provides for relief from a Judgment of the Court when "it is no longer equitable that the judgment should have prospective application." Fed.R.Civ.P. 60(b)(5). The Supreme Court has held that a party seeking modification of a consent decree under this rule "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, ——, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992).

Under *Rufo,* the party moving for modification must prove "either a significant change in factual conditions or in law." *Id.* However, a change in circumstances does not ordinarily warrant modification if it was actually anticipated at the time the consent decree was entered into, or if the change of circumstances was deliberately brought about by the moving party. *Id.* Similarly, modification is not warranted merely because "it is no longer convenient to live with the terms of the consent decree." *Id.*

■ The City argues that there has been a substantial change of circumstances since the City committed itself to the Rockland County plan on November 1, 1993. Paramount among these changes, according to the City, is that, as a result of the opposition in the State legislature, there now is no appropriation for the Rockland County plan in the State budget. The City also argues that the intervening change of administrations within the City and the new administration's emphasis on revitalizing the local economy justify modifying its court ordered obligations.

Mr. Powers, asked about the City's decision, testified on deposition as follows:

Q In dealing with the Rockland County proposal and coming to your ultimate decision, were you influenced in any way by political pressure?

A Not at all. It was an economic decision.

Q Were you subjected to any political pressure by anyone?

A No. People like [State Senator] Efrain Gonzalez spoke to me about it with deep concern. I never considered that political pressure at all.

. . . .

Q [W]ere [you] aware that [Assemblyman Sheldon Silver] was particularly concerned about the Rockland contract?

A ... I am aware now, but I was not aware at the time I made the decision of any deep concern that I recall. . . .

. . . .

At no point did he pressure me or did anybody.

. . . .

Q Did you have any concern that if the City did proceed with the Rockland contract that there might be repercussions in the State legislature that would be disadvantageous to the mayor [or the] City in any way?

A No.

Q Was there any way in which you thought the City might gain any benefit or advantage from the State legislature by not proceeding with the Rockland contract?

A No, no, no, I didn't view it as a legislative City thing. I viewed it as an economic impact situation, a job situation for the people of the City.

(Powers Dep. 72–77).

A March 29, 1994 letter from the Department of Corrections, formally informing OCC of the City's change of plans, tallies with Mr. Powers' testimony. It states that the City decided to keep the cook/chill project in the City because "it ha[d] the ability to generate jobs within the City." Although the letter also provides that legislative opposition in Albany formed part of the "larger context" for the decision, there is no indication in the letter, or anywhere else in the record, that legislative pressure was a determinative factor in the City's change of plans.

If the City had been forced to abandon the Rockland County plan because of an independent decision by the State not to fund the project, consideration of modification of the decree might have been appropriate. However, the record, in fact, establishes that the City abandoned the Rockland cook/chill plan on its own responsibility: the new administration simply disagreed with the old administration's view of the merits of the plan. Indeed, Mr. Powers testified at a hearing held on July 7, 1994 that the Mayor made the decision on March 18, 1994, almost two weeks before the State budget became law on March 31, 1994. (Powers Tr. 15).

Under *Rufo*, Rule 60(b)(5) modification of the court ordered obligations of a consent decree is not warranted merely because "it is no longer convenient to live with the terms of the consent decree." 502 U.S. at ——, 112 S.Ct. at 760. The City's change of heart about the economic merits of the Rockland County plan fits that description and, accordingly, the City's motion to modify its obligation to use the Rockland County production center under the 1992 Food Service Order is denied.

## II.

■ The 1992 Food Service Order provides at ¶ 3 that "[u]nexcused noncompliance with this revised work plan shall subject the defendants to monetary penalties pursuant to

the Court's separate Order re: Compliance with Work Plan Deadlines, entered July 10, 1992." That Order, in turn, creates a schedule of coercive fines. The City's unexcused failure to comply with its commitment of November 1, 1993 triggers the imposition of the monetary penalties.

The proper measure for the fine is the delay which the City's change of plans will, if long experience of delay in other City projects is an accurate guide, almost certainly cause in providing cook/chill services. Of course, the length of any actual delay cannot be determined until the City's proposed substitute project is completed. In the meantime, it is reasonable to assume that the delay be measured by the time elapsed between the City's making of its commitment on November 1, 1993 and breaking of that commitment on March 31, 1994. The penalty is to be assessed under ¶ 5(b) of the 1992 Compliance Order.

I recognize that the City contends that, contrary to present appearances, its change of plans will not delay the provision of cook/chill services to inmates. It aims to avoid delay by providing cook/chill food from an interim vendor yet to be selected, thereby "plac[ing] all the participants in the lawsuit in the same position as if the City had contracted with Rockland County." (Reply Mem. at 5). Indeed, Mr. Powers testified at the July 7, 1994 hearing that it is "very possible" that the City will be able to provide cook/chill services from an interim vendor even before they would have been available from the Rockland County facility. (Tr. 14).

If the City had adhered to the Rockland County plan, cook/chill services would have been available to inmates as early as "the end of 1994" (Aff. of Leonard Koerner, counsel to the City, ¶ 8)—the date by which the first receptor sites for cook/chill food at the individual jails (the so-called rethermalization units) will begin to come on line. If the City is indeed able to provide cook/chill services by that date—December 31, 1994—it may apply for recoupment of the penalty. If the City is able to provide cook/chill services within five months thereafter—the delay period for which the penalty imposed above has been assessed—it may apply for a propor-

tionate recoupment of the monetary penalty. However, if the actual period of delay in providing cook/chill services exceeds five months from December 31, 1994, plaintiffs may apply for the imposition of further penalties.

\* \* \*

As testified to by Mindy Tarlow, deputy director of the New York City Office of Management and Budget, but for the delay in the rethermalization project, it would have been possible to provide cook/chill services from the Rockland County facility as early as July 1994. (Tarlow Dep. 110). By setting December 31, 1994 as the date from which to measure delay in the City's provision of cook/chill services, the Court is allowing the City to benefit from the as yet unexcused delay in the rethermalization project.

Whether this is an appropriate allowance for the Court to make depends in turn on whether the delay in the rethermalization project is chargeable to the City—a determination that cannot be made on the present record. If the delay is indeed chargeable to the City, the proper remedy is a separate penalty for unexcused noncompliance with the rethermalization project deadlines. The plaintiffs are, of course, free to make such an application to the Court.

### III.

Plaintiffs have moved to hold the City in civil contempt for violating the 1992 Food Service Order. "Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damage sustained by reason of noncompliance." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949). A court may exercise its power to hold a party in civil contempt if (1) the order the party allegedly has failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply. *N.Y. State Nat. Organization For Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532

(1990). In the case at hand, there is no argument that the 1992 Food Service Order is unclear or ambiguous and the defendants do not dispute that they have failed to comply with it. Accordingly, the sole issue is whether the defendants have attempted diligently in a reasonable manner to comply.

The City argues that it has made a reasonable effort to comply with its court ordered cook/chill obligations because the interim vendor plan, if it proceeds according to schedule, will replicate the cook/chill service that would have been available from the Rockland County facility and will do so as soon as would have been the case if the Rockland County facility had been utilized. The City contends that the interim vendor plan "is intended to fulfill all of the elements of the Food Service Work Plan" and that there will be no injury to the inmates as a result of the change of plans.

In addition, Mr. Powers testified at the July 7, 1994 hearing that he was not aware that the City's court ordered cook/chill obligations required the City to adhere to its decision to use the Rockland County facility:

Q. Do you believe that the City has reneged by instituting this new program for Rockland County?

A. No, it was always my understanding that the mandate of the City was to deliver cook/chill food to the prisoners by certain dates. [T]he methodology of getting there, I felt, was a decision the City could make as long as we go there, that was what we had agreed to do. So I don't believe that by changing the methodology that had been previously selected we were reneging on anything.

(Tr. 19). Mr. Powers' belief that the City was not "reneging on anything" by abandoning the Rockland County plan, cannot be reconciled with his belief, also expressed at the July 7, 1994 hearing, that the City could not make that decision without the Court's approval (Tr. 26).

Moreover, it is clear from the record that Mr. Powers was informed by other City officials on several occasions prior to March 31, 1994 that the City was obligated to adhere to the Rockland County plan or risk court imposed fines. For example, Tarlow testified on deposition that, at a meeting on March 3, 1994, city officials including Mr. Powers talked about the Court's reaction if the City were to change its mind about the Rockland County plan, and specifically talked about the possibility and amount of fines (Tarlow Dep. 76–77). Moreover, a March 4, 1994 memo to Powers from Tarlow states that the 1992 Food Service Work Plan set a November 1, 1993 deadline for choosing a cook/chill option and that fines as high as $1000 per day "could be levied if the City did not meet this schedule." A March 18, 1994 memo to Powers from Tarlow states that "[a]s discussed, the Federal Court has strongly supported the Rockland County contract and has made clear that a deviation from that path could cause the City to be retroactively fined from November 1, 1993" and that the City "may be further subject to fines which escalate up to $1000 per day, or more."

Finally, Mr. Powers' belief, accepted as sincere, that the City was not "reneging on anything" by abandoning the Rockland County plan, although not irrelevant to a citation for civil contempt, does not preclude such a finding. "Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act." *McComb v. Jacksonville Paper Co.*, 336 U.S. at 191, 69 S.Ct. at 499.

The City's further argument—that it should not be held in contempt because it hopes to replicate the cook/chill services that would have been available from the Rockland County facility from an interim vendor—is also not persuasive. It is true that the City's interim plan, if it proceeds according to schedule, will avoid any delay in the provision of cook/chill services to inmates. For that reason, as discussed in Section II, the penalty imposed on the City will be recouped if the City can provide interim cook/chill services by December 31, 1994.

However, the City's new proposal, whether timely completed or not, does not diminish the fact that the City has "not diligently attempted in a reasonable manner to comply" with the court ordered obligation to consummate the Rockland County plan. Moreover, the City made no effort to support the Rock-

land County plan in the State legislature, even though it was clear that the State might otherwise not appropriate the necessary funds. For example, a March 4, 1994 memorandum to Peter Powers from Mindy Tarlow concludes that "it appears that active City support is necessary to ensure that the State appropriations are approved by the Legislature." In the absence of relief from the Court, the City was obligated to continue supporting the Rockland County project against its naysayers.

Finally, the City chose not to inform the Court that it was considering abandoning the Rockland County plan until after the final decision had been made, even though the City had been weighing the options for as long as two months. Although a party subject to decree provisions may not be legally obligated to inform the Court of a change of intentions before it has made a final decision, it cannot unilaterally alter the decree by acting on those intentions without court approval. In the circumstances, the sensible course would have been to inform the Court as soon as there was a substantial likelihood of a change of plans. Failure to do so violated the consultative compliance process which the parties to this case and the Court have created with arduous effort.

This litigation, which has endured for longer than either of the parties or the Court desires or believes is healthy, will never reach its objective if either of the parties unilaterally disregards its commitments. Yet that is exactly what the City did in this case. It made no effort to comply with its court ordered obligation to adhere to the Rockland County plan. It follows that the City has committed a civil contempt.

### IV.

■ There remains the question whether the City should be compelled to adhere to the Rockland County plan. On the one hand, it is true that, as discussed above, the City has not shown a basis for modifying its obligation to adhere to that plan. On the other hand, the State's intervening failure to appropriate the necessary State expenditures for the facility makes it politically impracticable to require the City to adhere to the plan. Indeed,

the plaintiffs have not requested such relief from the Court.

Although this Court may have the authority to compel the State to allocate the necessary funds for the Rockland County plan, such an order ought not be made lightly and does not appear appropriate in the circumstances of this case. Accordingly, the defendants are directed, instead, to submit to OCC a plan and timetable for completing the new cook/chill production center in New York City, with the expectation that after appropriate discussion with the parties, OCC will recommend a supplemental order to the Court.

### CONCLUSION

The City's motion to modify its obligation to use the Rockland County production center under the 1992 Food Service Order is denied. The plaintiffs' cross-motion for sanctions and to hold the City in contempt is granted.