OPINION AND ORDER
 

 SCHWARTZ, District Judge.
 

 INTRODUCTION
 

 Plaintiffs, various environmental organizations, initiated this action pursuant to the “citizen suit” provision, section 505 of the Clean Water Act
 
 [1]
 
 (“CWA” or “the Act”), 33 U.S.C. § 1365, to compel the United States Environmental Protection Agency (“EPA”), through its Administrator,
 
 [2]
 
 to issue regulations under section 316(b) of the Act governing the location, design, construction, and capacity of existing and new cooling water intake structures, particularly those employed by electrical utilities. (Amended Complaint ¶ 31.) Plaintiffs allege that, in the absence of these regulations, power companies are failing to satisfy the requirement under section 316(b) that cooling water intake structures reflect the “best technology available” for minimizing adverse environmental impact.
 
 (Id.
 
 ¶¶ 28-29.)
 

 On July 24, 1995, this Court denied a motion by 56 individual electric utility companies, the Edison Electric Institute, the National Rural Electric Cooperative Association, and the American Public Power Association to intervene in this action pursuant to Rule 24 of the Federal Rules of Civil Procedure (“Fed. R. Civ.P.”).
 
 [3]
 

 See Cronin v. Browner,
 
 898 F.Supp. 1052 (S.D.N.Y.1995). A Consent Decree (the “Consent Decree”) was entered into by the parties and approved by this Court on October 10, 1995. This case is before the Court on a motion by defendant to modify the Consent Decree pursuant to Fed. R.Civ.P. 60(b)(5).
 
 [4]
 
 For the reasons set
 
 *366
 
 forth below, the motion to modify the Consent Decree is granted in part and denied in part.
 

 BACKGROUND
 

 Familiarity with the parties and subject matter in dispute in this action is presumed.
 
 See Cronin v. Browner,
 
 898 F.Supp. 1052 (S.D.N.Y.1995).
 

 By passing the Clean Water Act, Congress intended to “restore and maintain the chemical, physical, and biological integrity of the Nation’s waters.” CWA § 101(a); 33 U.S.C. § 1251(a). Among the Act’s goals is the “attainment of water quality which provides for the protection and propagation of fish, shellfish, and wildlife.” CWA § 101(a)(2); 33 U.S.C. 1251(a)(2). The Act charges the EPA Administrator with administration of the Act’s provisions. CWA § 101(d); 33 U.S.C. 1251(d).
 

 Section 316(b) of the Act, 33 U.S.C. § 1326(b), entitled “Thermal Discharges,” provides that standards promulgated under CWA sections 301
 
 [5]
 
 and 306
 
 [6]
 
 , 33 U.S.C. §§ 1311 and 1316, must require cooling water intake structures to “reflect the best technology available for minimizing adverse environmental impact.” Although EPA issued a final regulation under section 316(b) in 1976, the regulation was challenged by certain utility companies and rejected by the Fourth Circuit the next year because of a procedural deficiency in its promulgation.
 
 See Appalachian Power Co. v. Train,
 
 566 F.2d 451, 457 (4th Cir.1977). Since EPA withdrew the regulation in 1979, there has been no regulation governing cooling water intake structures. Plaintiffs in this action seek to reqqire EPA to promulgate a new regulation (the “Regulation”).
 

 Industrial facilities employing cooling water intake structures have two types of cooling water systems: “once through” systems that require substantial quantities of water for cooling (approximately 300,000 gallons per minute for an average size steam electric power plant); and “closed cycle” systems that require less water because they recycle the water drawn into the system. (Affidavit of Christopher H. Bartle, annexed as Appendix A to Plaintiffs Memorandum of Law (“Bartle Aff.”) 1Í 41.) Both cooling systems use water drawn from the fresh and salt water bodies located adjacent to the facilities.
 
 (Id.)
 

 The most significant environmental impacts from cooling water intake structures are “entrainment” and “impingement” of organisms. (Declaration of J. Charles Fox (“Fox Deck”) ¶ 7.) Entrainment occurs when aquatic organisms, eggs, and larvae are taken into a facility’s cooling water system, pass through its heat exchanger, and then are discharged out of the facility.
 
 (Id.)
 
 In the process, these organisms are exposed to high temperatures, toxicity, and mechanical shock. (Bartle Aff. ¶ 43.) Impingement occurs when fish and other aquatic organisms are trapped on screens or other devices at the entrance to a facility’s cooling water intake structure. (Fox Deck ¶ 7.) Aquatic organisms and ecosystems may also be harmed as a result of damage to habitats caused by an industrial facility’s discharge of heated water after it has proceeded through the plant’s condenser system.
 
 See
 
 James R. May & Maya K. van Rossum,
 
 The Quick and the Dead: Fish Entrainment, Entrapment, and the Implementation and Application of Section 816(b) of the Clean Water Act,
 
 20 Vt. L.Rev. 373, 382 (1995) (citing Effluent Guidelines Division, Office of Water and Hazardous Materials, United States Environmental Protection Agency, Devel
 
 *367
 
 opment Document for Best Technology Available for the Location, Design, Construction and Capacity of Cooling Water Intake Structures for Minimizing Adverse Environmental Impact 6 (1976) [hereinafter “1976 Development Document”]). As EPA has noted, cooling water systems “may interfere with the maintenance or establishment of optimum yields of sport or commercial fish and shellfish, decrease populations of endangered organisms, and seriously disrupt sensitive ecosystems.”
 
 Id.
 
 at 383.
 

 A wide variety of industrial facilities make use of cooling water, including electrical utilities, non-utility power producers (i.e. facilities that generate electric power but sell it to another entity for transmission), pulp and paper manufacturers, chemicals manufacturers, and petroleum manufacturers. (Fox Decl. ¶ 8.) EPA estimates that over 414,000 facilities are potentially affected by the Regulation sought by plaintiffs.
 
 (Id.)
 
 As a result of the diversity of industries and other entities potentially affected by and interested in the regulation of cooling water structures, EPA states that an unusually large number of entities have been active in EPA’s section 316(b) rulemaking proceedings to date. (Fox Deck ¶ 9.)
 

 Consent Decree
 

 The Consent Decree was entered into by the parties on October 10, 1995. It recognizes that “it is in the best interests of the public, the parties and judicial economy to resolve the Action without further litigation.” (Consent Decree, Preamble.) The Decree provides for a process that culminates in the proposal and promulgation of the Regulation, and originally stated that EPA would propose the Regulation no later than July 2, 1999.
 
 (Id.
 
 ¶ 2(a).) By subsequent Stipulations and Orders, the Court extended this deadline to October 4, 1999, then to May 13, 2000, and then to the current deadline of June 5, 2000. (Stipulation and Order dated June 28, 1999, annexed as Exhibit B to Fox Deck; Stipulation and Order dated March 2, 2000). Further, the Consent Decree provides that EPA shall take final action with respect to the Regulation no later than August 13, 2001.
 
 (Id.
 
 ¶ 2(b).) “Take Final Action” is defined as a final decision by the EPA Administrator on the issuance of regulations after fully considering and responding to public comments as required by the Administrative Procedure Act, 5 U.S.C. § 553(c).
 
 (Id.
 
 ¶ 1(f).) The Consent Decree further provides that it may be modified by “(i) written consent of the parties hereto and subsequent approval by the Court, or (ii) by the Court following motion of a party for good cause shown.”
 
 (Id.
 
 ¶ 4(a).) The Decree gives the Court unlimited equitable powers to modify any term upon a showing of good cause by either party.
 
 (Id.
 
 ¶ 4(b)(v).)
 

 Progress After the Consent Decree
 

 Section 316(b) rulemaking has proven to be extraordinarily complicated. (Fox Deck ¶ 10.) First, EPA does not have extensive experience in rulemaking of this nature because most of the other regulations it has enacted with respect to water pollution under the Clean Water Act apply to the discharge of pollutants and waste-water, rather than the intake of water for cooling purposes.
 
 (Id.)
 
 Further, section 316(b) rulemaking is more difficult than the creation of effluent guidelines for wastewater because wastewater guidelines normally cover one industry and section 316(b) encompasses all industries with facilities employing cooling water intake structures.
 
 (Id.)
 
 Defendant has presented additional information supporting its contention that section 316(b) rulemaking is an inherently complicated endeavor. (Fox Deck ¶¶ 11-14.)
 

 Despite these challenges, EPA has made progress toward the promulgation of the Regulation. First, EPA has “collected and analyzed a great deal of existing data and information relevant to the development of the regulation.” (Fox Deck ¶ 17.) EPA administrators have produced background papers concerning cooling water intake structures and technologies, reviewed past
 
 *368
 
 316(b) studies conducted by utilities, and visited over a dozen facilities in order to profile different water body types, cooling water intake technologies, and cooling systems.
 
 (Id.
 
 ¶ 16; Declaration of Michael B. Cook (“Cook Decl.”) ¶ 6). Second, EPA has made progress in evaluating the technology costs associated with the Regulation, in particular those costs that individual facilities might incur in purchasing and employing different cooling water intake technologies. (Fox Decl. ¶ 18.) Third, EPA has begun a series of “watershed case studies” focusing on the cumulative adverse environmental impact of intake structures on a water body from which several facilities draw cooling water. (Fox Decl. ¶ 19.) Fourth, EPA administered a “screener survey” to 2,600 facilities that employ cooling water intake structures in order to determine which facilities will be used as part of a more detailed survey.
 
 (Id.
 
 ¶ 20). EPA has completed work on a detailed survey questionnaire, and gained government approval for its distribution. (Cook Decl. ¶ 4.) The Agency was due to distribute the questionnaire at the beginning of 2000.
 
 (Id.)
 
 Fifth, EPA released a “draft framework”r the Regulation shortly before a one-day public meeting held,on June 29, 1998. (Fox Decl. ¶ 21.) EPA then revised the draft and discussed issues associated with the draft at a two-day public meeting held on September 10 and 11, 1998.
 
 (Id.)
 

 Alleged Reasons for Delay
 

 EPA states that it has been unable to meet the deadline provided in the Consent Decree for the promulgation of the Regulation. The Declaration of J. Charles Fox, EPA Assistant Administrator for Water, sets forth five principal reasons for EPA’s delay.
 

 First, EPA has faced difficulties in acquiring data. The Agency claims that when it entered into the Consent Decree it believed that available sources of information, such as secondary sources or past section 316(b) studies, would detail which facilities employ cooling water intake structures.
 
 (Id.
 
 ¶ 28.) However, EPA found that no such information was available, and needed to make use of the screener survey to identify facilities using cooling water intake structures before the Agency could issue the detailed survey questionnaire.
 
 (Id.)
 

 Second, since EPA entered into the Consent Decree, the procedures for obtaining approval for an Information Collection Request (“ICR”) under the Paperwork Reduction Act, 44 U.S.C. § 3501 et seq., have changed. EPA asserts that it assumed at the time of the Consent Decree schedule that the Office of Management and Budget (“OMB”) would approve survey questionnaires in 90 days.
 
 (Id.
 
 ¶ 29.) However, under new procedures adopted after the Consent Decree, the approval process takes at least 180 days.
 
 (Id.)
 
 EPA notes in particular that OMB clearance for the screener survey took several months longer than was contemplated at the time of the Consent Decree.
 
 (Id.
 
 ¶¶ 29-30.)
 

 Third, EPA points to delays arising from expanded public outreach. Comments received by EPA from industry and environmental group stakeholders on the screener survey and detailed questionnaire have raised significant policy issues requiring discussion at senior levels.
 
 (Id.
 
 ¶ 31.) In addition, new requirements have been imposed by the Small Business Regulatory Enforcement Fairness Act (SBREFA), 5 U.S.C. §§ 601-612, which requires
 
 inter alia
 
 that EPA conduct formal outreach to small business entities to assess potential adverse economic impacts of the Regulation.
 
 (Id.
 
 ¶ 34.) EPA estimates that SBREFA requirements will delay the rule-making process for four months prior to the issuance of any formal proposal.
 
 (Id.)
 

 Fourth, EPA states that, initiahy, the Agency only intended to conduct studies of individual facilities, as is typical in other CWA rulemaking, in order to evaluate the environmental effect of cooling water intake technologies. However, due to the difficulty in understanding the cumulative
 
 *369
 
 environmental impact of multiple intake structures on a water body, EPA later decided that case studies of entire watersheds would be necessary.
 
 (Id.
 
 ¶ 32.) These studies will delay the rulemaking process for an additional 12 months.
 
 (Id.)
 

 Fifth, EPA contends that efforts to deregulate the utility industry have resulted in changes, such as the purchase and sale of power by non-utilities, which complicate EPA economic cost analyses. In particular, EPA states that data acquisition is difficult because economic data are publicly available for traditional utilities, but not for non-utilities.
 
 (Id.
 
 ¶ 35.)
 

 EPA believes that these delays will prevent it from issuing a proposed Regulation until May 2001, with no final action being taken prior to March 2003.
 
 (Id.
 
 ¶ 36.) For this reason, EPA moves to modify the Consent Decree in order to (i) extend the deadlines for the rulemaking, and (ii) allow the Agency to complete some of the rule-making before May 2001.
 

 Motion for Modification
 

 Defendant moves to modify the Consent Decree in two respects. First, defendant proposes to bifurcate the rulemaking process into two phases: Phase One, which addresses new facilities that will employ cooling water intake structures; and Phase Two, which addresses existing facilities that employ cooling water intake structures.
 
 (Id.
 
 ¶ 5.)
 

 Second, defendant moves to extend the current deadlines for the proposal and promulgation of the Regulation. Defendant suggests that the Phase One proposal would be issued on October 5, 2000, and that final action on the Phase One Regulation would be taken by May 16, 2002.
 
 (Id.)
 
 Defendant further suggests that the Phase Two proposal would be issued on May 16, 2002, and that final action on the Phase Two Regulation would be taken by April 1, 2004.
 
 (Id.)
 
 Defendant notes that its current work program is directed toward meeting these deadlines. (Cook Decl. ¶ 2.)
 

 DISCUSSION
 

 I. The
 
 Rufo
 
 Standard for Modification of Consent Decrees
 

 The dispute in this case revolves around defendant’s motion to modify the Consent Decree signed by the parties on October 10, 1995. Fed.R.Civ.P. 60(b)(5) (“Rule 60(b)(5)”) authorizes the Court to modify any final judgment or order when “it is no longer equitable that the judgment should have prospective application.” Although a consent decree is contractual in nature, it is also “an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.”
 
 See Rufo v. Inmates of Suffolk County Jail,
 
 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (citing
 
 System Federation No. 91 Ry. Emp. Dept., AFL-CIO v. Wright,
 
 364 U.S. 642, 650-651, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961)).
 

 Under
 
 Rufo,
 
 the party seeking modification of a consent decree must satisfy two requirements. First, the moving party bears the burden of establishing that a significant change in circumstances warrants revision of the decree.
 
 See Rufo, supra,
 
 502 U.S. at 383, 112 S.Ct. 748;
 
 see also New York State Ass’n for Retarded Children, Inc. v. Carey,
 
 706 F.2d 956, 969-70 (2d Cir.1983);
 
 Philadelphia Welfare Rights Org. v. Shapp,
 
 602 F.2d 1114, 1119—1121 (3d Cir.1979).
 
 Rufo
 
 described three factual conditions supporting modification of a consent decree because of a significant change: (a) when changed factual conditions make compliance with the decree substantially more onerous; (b) when a decree proves to be unworkable because of unforeseen obstacles; or (c) when enforcement of the decree without modification would be detrimental to the public interest.
 
 See Rufo, supra,
 
 502 U.S. at 384, 112 S.Ct. 748. Second, if the moving party meets this burden, the Court must consider whether the proposed modification is suitably tailored to the changed circum
 
 *370
 
 stances.
 
 See id.
 
 at 383, 112 S.Ct. 748;
 
 Juan F. v. Weicker,
 
 37 F.3d 874, 878 (2d Cir.1994). That is, the moving party must show that the proposed modification is “tailored to resolve the problems created by the change in circumstances.”
 
 Rufo, supra,
 
 502 U.S. at 391, 112 S.Ct. 748.
 

 The Supreme Court in
 
 Rufo
 
 cautioned that modification should generally not be granted where a party relies on circumstances or events that were anticipated at the time it entered into the decree.
 
 See id.
 
 at 385, 112 S.Ct. 748 (citations omitted). Under these conditions, the moving party must “satisfy a heavy burden to convince a court that it agreed to the decree in good faith [and] made a reasonable effort to comply with the decree.”
 
 Id.
 
 Modification is not available simply because “it is no longer convenient to live with the terms of a consent decree.”
 
 Id.
 
 at 383, 112 S.Ct. 748.
 

 II. Applicability of the
 
 Rufo
 
 Standard to this Case
 

 Rufo
 
 focused on institutional reform litigation, and its findings were specifically addressed to that context.
 
 See id.
 
 at 393, 112 S.Ct. 748. While the reform of government institutions is not directly at issue in this case, the Court finds that the present case is sufficiently analogous to an “institutional reform” case to be controlled by the
 
 Rufo
 
 standard.
 
 Cf. Keith v. Volpe,
 
 960 F.Supp. 1448, 1459 (C.D.Cal.1997) (finding that
 
 Rufo
 
 controlled in “closely analogous” case where two private-sector parties sought modification of a consent decree entered into in connection with a freeway construction project). This is a suit to enforce a statutory mandate directed to a government agency, and focuses directly on the regulatory practices of that agency in the context of the possible reform of those practices. The Consent Decree at issue in the instant case, like that in
 
 Rufo,
 
 “reach[es] beyond the parties involved directly in the suit and impact[s] on the public’s right to the sound and efficient operation of its institutions.”
 
 Rufo,
 
 502 U.S. at 381, 112 S.Ct. 748 (quoting
 
 Heath v. De Courcy,
 
 888 F.2d 1105, 1109 (6th Cir.1989)).
 

 Moreover, there is significant authority to support the application of
 
 Rufo
 
 in non-institutional reform cases, even in actions brought against non-governmental entities.
 
 See, e.g., United States v. Eastman Kodak Co.,
 
 63 F.3d 95, 101-02 (2d Cir.1995) (applying
 
 Rufo
 
 standard to terminate antitrust consent decrees);
 
 Patterson v. Newspaper and Mail Deliverers’ Union of New York,
 
 13 F.3d 33, 37-38 (2d Cir.1993) (applying
 
 Rufo
 
 to modification of consent decree reached in civil rights litigation);
 
 United States v. Western Elec. Co.,
 
 46 F.3d 1198, 1203 (D.C.Cir.1995) (noting, in modifying antitrust consent decree, that Rufo’s “summary of what might render a modification ‘equitable’ relates to all types of injunctive relief’);
 
 In re Hendrix,
 
 986 F.2d 195, 198 (7th Cir.1993) (noting that
 
 Rufo
 
 standard is “no less suitable” to non-institutional cases).
 

 III. Defendant Has Demonstrated a Significant Change of Circumstances Warranting Modification of the Consent Decree
 

 The issues to be determined in this case are twofold: (1) whether the circumstances in existence at the time of the Consent Decree changed significantly such that a modification of the Decree is warranted; and (2) if so, whether the proposed modification is suitably tailored to the changed circumstances. The Court finds that defendant has successfully shown that changed circumstances require modification of the Consent Decree in order to safeguard the public interest. However, the Court finds that defendant’s proposed modification is not appropriate given the strength of the public interest in the prompt issuance of the Regulation.
 

 A. Defendant’s Alleged Factual Changes, On Their Own, Do Not Justify Modification
 

 Defendant contends that the unexpected scope and complexity of section
 
 *371
 
 316(b) rulemaking and other events that have occurred since the signing of the Consent Decree justify modification of the Decree. As discussed
 
 supra,
 
 defendant points to five circumstances that have caused a delay in promulgating the Regulation. Clearly delays have occurred in the rulemaking process. However, the events highlighted by defendant do not meet the
 
 Rufo
 
 standard because they were, for the most part, foreseeable and, even if unforeseeable, have not made compliance substantially more onerous as to make the Consent Decree unworkable. The Court need only briefly address defendant’s alleged justifications, because the Court finds that the public interest in a sound regulation supports modification of the decree.
 

 1. Available Data
 

 Defendant asserts that it has had extreme difficulty in acquiring data related to individual facilities that use cooling water intake structures and therefore needed to make use of preliminary screener surveys in order to identify such facilities. (Fox Decl. ¶ 28.) The alleged data deficiencies, however, were foreseeable. The scientific issues concerning the regulation of cooling water intake structures have existed since the promulgation of the Clean Water Act in the 1970s. (Plaintiffs Memorandum of Law (“PL’s Mem.”) at 13.) The Agency had an opportunity to gather information about industries employing cooling water in the preparation of the 1976 proposed Regulation and in the permit proceedings in which it considered section 316(b). Further, in 1994, EPA produced technical background papers on the use of cooling water structures by selected industries and Clean Water Act regulatory implementation. (Fox Decl. ¶ 16; Cook Decl. ¶ 6.) Direct contact with and exposure to affected industries should have made it apparent to EPA that there were deficiencies in available data requiring the use of a screener survey. Moreover, even if these deficiencies were not foreseeable, EPA has not demonstrated that the delays resulting from the alleged information deficiencies made the Consent Decree unworkable or that compliance with the Decree was substantially more difficult as a result.
 
 (See
 
 Fox Decl. ¶ 28);
 
 see also Hadix v. Johnson,
 
 879 F.Supp. 743, 748 (E.D.Mich.1995) (finding that while the introduction of prison inmates designated for administrative segregation constituted a factual change, it did not make government’s compliance with prison consent decree substantially more onerous or unworkable).
 

 2. OMB Approval Procedures
 

 Defendant asserts that changes to Office of Management and Budget (“OMB”) regulations governing clearance of Information Collection Requests (“ICR”s) for the screener survey and full questionnaire have caused significant delays that were not contemplated at the time of the Consent Decree. (Fox Decl. ¶¶ 29-30.) The Court acknowledges that this regulatory change was unforeseeable. However, the Court finds that the delays in ICR approval, while considerable, did not delay the rulemaking process enough to make the Consent Decree unworkable or compliance substantially more onerous. (Fox Decl. ¶ 30);
 
 see also Hadix, supra,
 
 879 F.Supp. at 748;
 
 Carty v. Farrelly,
 
 957 F.Supp. 727, 747 (D.Vi.1997) (finding that modification of prison consent decree was not justified under
 
 Rufo
 
 where government incurred substantial increases in costs due to freak weatherstorms that were not anticipated). In particular, defendant has not shown that its other research (e.g. watershed studies, technological analysis, and economic analysis) could not proceed while its surveys were pending before OMB.
 

 3. Expansion of Public Outreach
 

 Defendant asserts that modification of the Consent Decree is justified because of delays caused by its expansion of public outreach. In particular, EPA mentions delays due to internal agency review of
 
 *372
 
 public commentary and to the Small Business Regulatory Enforcement Act (SBREFA), which forced EPA to expand its outreach to small businesses that will be affected by the Regulation. (Fox Decl. ¶¶ 31, 34.) The Court finds that while the SBREFA requirements were not foreseeable, delays due to public comments were foreseeable, as EPA’s rule-making procedures require extensive public commentary and the integration of such commentary into the decision process.
 
 See
 
 Administrative Procedure Act, 5 U.S.C. § 553(c). Moreover, defendant has not shown that either change was a significant change that would affect compliance with the Consent Decree.
 
 See Hadix, supra,
 
 879 F.Supp. at 748;
 
 Carty, supra,
 
 957 F.Supp. at 747. In particular, defendant has not demonstrated that it could not conduct its public outreach while simultaneously proceeding with the scientific, technical, and economic analysis necessary to complete its rulemaking.
 

 4. Watershed Case Studies
 

 Defendant asserts that it was not foreseeable at the time of the Consent Décree that it would need to conduct studies of the watershed areas surrounding cooling water intake facilities. (Fox Decl. ¶ 32.) However, this decision does not constitute a change in circumstances justifying modification under
 
 Rufo,
 
 because the decision to conduct watershed studies was taken on the basis of the Agency’s own regulatory judgment. (Pl.’s Mem. at 16 n. 6);
 
 see also Benjamin v. Malcolm,
 
 156 F.R.D. 561, 564 (S.D.N.Y.1994) (Lasker, J.) (finding that change in circumstances does not warrant modification of a consent decree when the change was “deliberately brought about by the moving party”);
 
 Building Industry Ass’n v. Babbitt,
 
 70 F.Supp.2d 1, 3 (finding that the effect of a court judgment was not a change in circumstances because plaintiff sought the relief granted by the opinion in question). As EPA itself acknowledged in its 1976 Development Document, cooling water intake structures not only impact the organisms in immediate proximity to electric utilities, but especially when there are multiple utilities in one area, also may affect aquatic ecosystems on a local and regional level.
 
 See
 
 James R. May
 
 &
 
 Maya K. van Rossum,
 
 The Quick and the Dead: Fish Entrainment, Entrapment, and the Implementation and Application of Section 816(b) of the Clean Water Act, supra,
 
 at 382-83; (Fox Deck ¶ 32; Bartle Aff. ¶ 42.) EPA should have anticipated the necessity of watershed studies to the assessment of adverse environmental impact. Moreover, EPA has not demonstrated that the Consent Decree was unworkable or that compliance with it was more onerous on account of the expansion of its research.
 
 See Hadix, supra,
 
 879 F.Supp. at 748.
 

 5. Deregulation of the Electric Utility Industry
 

 Finally, EPA argues that modification of the Consent Decree is warranted because of complications to its economic analysis due to the deregulation of the electric utility industry, specifically the entrance of new industry interests that can buy and sell power. (Fox Decl. ¶ 35.) While the Court accepts that changes to the shape of the subject industry were unforeseeable at the time of the Consent Decree, it cannot find that these changes were significant enough to invalidate the Consent Decree or make compliance substantially more difficult.
 
 See Carty, supra,
 
 957 F.Supp. at 747. Economic data are available for the capital enterprises which purchase power plants, through corporate reports, periodic filings under the Securities Act of 1934, 15 U.S.C. § 78, or filings with state governments. (PL’s Mem. at 15 n. 3.) Further, EPA has not specified the nature of the delay caused by the alleged complications. (Fox Decl. ¶ 35.)
 

 B. Enforcement of the Consent Decree in its Present Form Would Harm the Public Interest
 

 While defendant’s explanations for its previous delays do not justify modification
 
 *373
 
 of the Consent Decree, the public interest does require that the Decree be modified to enable EPA to produce a sound Regulation. (Defendant’s Memorandum of Law (“Def.’s Mem.”) at 21-22.)
 

 A certain flexibility is required when the consent decree in question greatly affects the public interest.
 
 See Rufo,
 
 502 U.S. at 381, 112 S.Ct. 748 (citing
 
 Carey, supra,
 
 706 F.2d at 969;
 
 Heath, supra,
 
 888 F.2d at 1109);
 
 see also id.
 
 at 382-83, 112 S.Ct. 748 (noting that flexibility is necessary when considering requests for modification of an institutional reform consent decree, where the public interest is strongly implicated).
 
 Cf. Hook v. Arizona,
 
 98 F.3d 1177, 1179-1180 (9th Cir.1996) (finding that the district court should have exercised flexibility in modifying prison consent decree in the public interest). This flexibility is designed “to permit details in complicated decrees ... to be adapted to changing conditions so that the public interest can be preserved.”
 
 Juan F., supra,
 
 37 F.3d at 879.
 

 The Court believes that such flexibility is necessary to safeguard the public interest, which is particularly strong in this case.
 
 [7]
 
 The public has a significant interest in ensuring that the government does not promulgate rules via a process that emphasizes expediency over quality and accuracy. (Def.’s Mem. at 21-23.) In this case, it is important that the regulations have a sound, scientific basis, comport with the requirements of the CWA, are compatible with other regulatory programs, and further EPA’s broad policy goals of protecting human health and the environment. (Def.’s Mem. at 22.)
 
 [8]
 
 Moreover, the Consent Decree in this case itself provides for such flexibility because it contains a provision for the modification of deadlines. (Consent Decree ¶ 4.)
 

 Defendant has not sufficiently demonstrated to the Court that the previous delays were the result of a “significant change in circumstances” justifying a modification of the Decree. However, regardless of the reasons therefor, the Court notes that the delay is now a reality, and EPA has demonstrated that it will not be able to meet the current deadline due to the technical and scientific complexity of the rulemaking effort. (Def.’s Rep. at 2.) Many of the facts discussed by defendant in its submissions are relevant here. EPA has undertaken a complex, multi-faceted project that has required substantial Agency resources, and much of the work still needs to be completed. First, EPA has sent or will imminently send out a 100-page questionnaire to several hundred industrial facilities designed to gather technical, environmental, and economic data concerning existing cooling water intake structures. (Fox Decl. ¶ 40; Cook Deck ¶ 4.) EPA must await the questionnaires’ return, process the responses, and factor the responses into its decision making process. Second, the Agency must continue to pursue its studies of the watersheds surrounding the facilities that will be affected by the Regulation. These studies require extensive scientific analysis. (Fox Deck ¶¶ 19, 32; Def.’s Rep. at 6.) Third, EPA must gather and interpret commentary from governments, small businesses,
 
 *374
 
 and other private sector entities concerning the economic and environmental impact of the Regulation.
 
 [9]
 
 (Fox Decl. ¶¶ 81, 45; Def.’s Rep. at 6.) Fourth, EPA must gain approval from senior management on the governing regulatory approach, and then compose the proposed Regulation, beginning with the preparation of a draft preamble. (Fox Decl. ¶¶ 44, 46.) Fifth, following the publication of its proposal, EPA must gather, interpret, and respond to public commentary, identify issues requiring decisions by senior managers, revise the reports concerning the future impact of the Regulation, and prepare the final Regulation.
 
 (Id.
 
 ¶¶ 48-50.)
 

 Because of the significant amount of work remaining to be completed, the Court concludes that EPA cannot promulgate a scientifically and legally defensible regulation by June 5, 2000. The public interest in the prompt issuance of a Regulation, while important in the consideration of modification deadlines, is outweighed in the short term by the need to prepare a regulation that minimizes adverse environmental impact under section 316(b) and enables an attainment of water quality which provides for the “protection and propagation of fish, shellfish, and wildlife.” CWA § 101(a)(2).
 

 IV. Defendant Has Not Shown that its Proposed Modification is Suitably Tailored to the Changed Circumstances
 

 Because the Court has found that modification of the Consent Decree is required, consideration must be given to whether the proposed modification is suitably tailored to the circumstances giving rise to the modification.
 
 See Rufo, supra,
 
 502 U.S. at 383, 112 S.Ct. 748;
 
 Juan F, supra,
 
 37 F.3d at 878. While the Court agrees with defendant’s proposed bifurcation method, it cannot find that the suggested modification deadlines are suitably tailored to the changed circumstances when due consideration is given to the interest of the public in the prompt issuance of the Regulation.
 

 A. Bifurcation
 

 Defendant has suggested a modified schedule that provides for (i) a Phase One Regulation for new facilities that would be proposed on October 5, 2000 and promulgated on May 16, 2002; and (ii) a Phase Two Regulation that would be proposed on May 16, 2002 and promulgated by April 1, 2004. (Cook Decl. ¶ 2.) Defendant claims that its proposed schedule is “suitably tailored to deal with the changed circumstances,” (Defs Rep. at 10), because it believes that the proposed schedule will provide a “realistic opportunity” for the Agency to complete its work on the regulation with the proper balance of expediency and quality designed to serve the public interest. (Def.’s Mem. at 22.) In particular, defendant states that the suggested bifurcation process will allow it to issue the Phase One Regulation while the Agency continues to gather and analyze data on existing structures through the survey questionnaire, which will assist in the development of the Phase Two Regulation. (Fox Decl. ¶ 39.) During the Phase Two development period, the Phase One Regulation will assist EPA in evaluating existing technologies, their adverse environmental impacts, and the possibilities of reducing that impact through mitigation techniques. (Fox Decl. ¶ 38.) Further, by providing a benchmark for important concepts such as “best technology available” and “adverse environmental impact,” the Phase One Regulation will address issues that are the subject of disputes in EPA permit proceedings for both new and existing facilities.
 
 (Id.
 
 ¶ 38.) EPA claims that if its modification proposal is rejected and the Court imposes a shorter time period for developing the Regulations, the scienti-
 
 *375
 
 fie and legal defensibility of the rule will be placed at substantial risk.
 
 (Id.
 
 ¶ 54.)
 

 The Court recognizes that bifurcation will result in some delay in the full implementation of CWA regulations concerning cooling water intake structures. It also recognizes that by creating two separate regulatory development processes, bifurcation creates more work for EPA and other administrative agencies because public comment and procedural requirements must be met on two separate occasions. (Attachs. B and C to the Fox Decl.)
 

 However, the record reflects that bifurcation is a sensible strategy because it offers a mechanism for the promulgation of a sound, albeit partial, regulation in the shortest time. First, the public has a strong interest in the promulgation of the Regulation as quickly as possible. Indeed, plaintiffs aver that there is an urgent need for regulations governing new facilities, because of the many new facilities applying for permits as a result of industry deregulation. (Pl.’s Mem. at 3.) EPA has made it clear that effective regulation for new facilities can be issued earlier, and a reversion to a single-rule framework would result in needless delays in this regulation.
 
 [10]
 
 (Fox Decl. ¶¶ 36, 38.) Second, there are obvious merits of bifurcation as a method of producing quality regulations, in particular the possible benefits of the Phase One Regulation to the Phase Two rulemaking process, and over the short term, to the permit application process for new and existing facilities. Third, the election of bifurcation as a method is a procedural choice. Regardless of the deadlines eventually set, EPA will generate different rules for new and existing facilities given the differences in regulatory oversight required for each.
 
 [11]
 
 Fourth, the Court notes that plaintiffs do not disagree with bifurcation as a method.
 
 [12]
 
 (Pl.’s Mem. at 2.)
 

 B. Modified Deadlines
 

 Defendant has set forth a draft schedule based on its suggested modification dates. (Attachs. B and C to the Fox Decl.) EPA estimates that it will need over six months to complete a Phase One proposal. In particular, EPA estimates that by April 2000 it will have completed its data gathering and public outreach, prepared drafts of the necessary background documents, and prepared the draft preamble and draft proposed Regulation. (Attach. B to the Fox Decl.) EPA estimates it will need five to six months to obtain the necessary approvals from EPA senior management and from OMB, and to make the necessary revisions to the Regulation before it is published.
 
 (Id.)
 
 EPA states that final action will take approximately 20 more months, given the time required for gathering and analysis of public commentary, revision of documents, and final internal and OMB review.
 
 (Id.)
 

 EPA estimates that the Phase Two proposal can be published on the same day as the Phase One Final Regulation. Its development involves concurrent review and analysis of the detailed questionnaire and the watershed case studies, which EPA expects to take one year, and then a new round of data gathering, public outreach, and drafting, which will take an additional eight months. (Attach. C to the Fox Decl.) Then, EPA claims, it will need an
 
 *376
 
 other seven months to gain the necessary approvals and publish the proposed Phase Two Regulation.
 
 (Id.)
 
 EPA states that final action will take over 22 months more, given an extended public comment period and the extensive internal and OMB review which is required.
 
 (Id.)
 

 Defendant asserts that its proposed schedule is entitled to “great deference” from this Court, because of the scientific and technical expertise involved. (Def.’s Mem. at 23.) Defendant contends that “[c]ourts should not interfere with an agency’s determination of its own priorities.”
 
 (Id.
 
 at 23-24.) The Court disagrees. It is important that the modification imposed by the Court achieves a balance between expediency and quality. (Def.’s Mem. at 22-23.) EPA has not demonstrated why the public interest necessitates a delay of over two years for the promulgation of the Phase One Regulation and over four years for the promulgation of the Phase Two rule. (Fox Deck ¶¶ 43 — 68). Moreover, the Agency has thus far failed to comply with the congressional mandate under the Clean Water Act to promulgate rules for cooling water intake structures, a mandate issued more than a quarter century ago. (Pk’s Mem. at 10.) As plaintiffs point out, too long a delay could harm the public interest as much as incomplete or low quality regulations.
 
 (Id.
 
 at 19-20.) The absence of national standards governing the construction and operation of cooling water intake structures continues to pose a threat to estuaries and marine ecosystems, and if left unaccounted for, could “set the remediation of our nation’s fisheries back for years to come.”
 
 (Id.
 
 at 22.)
 

 For these reasons, the Court finds that the public interest requires that the proposed Phase One Regulation be issued sooner than the deadline proposed by defendant. EPA has not demonstrated why its internal revision and approval process will require three months, nor why OMB approval and preparation of the final documents, which EPA claims it will pursue concurrently with its other efforts, will take six months. (Fox Deck ¶¶ 46-47.) Accordingly, the Court orders EPA to promulgate the Phase One proposal by July 20, 2000.
 

 The Court concludes that defendant’s estimated deadlines for the Phase Two proposal should also be shortened. First, while the analysis and review of the questionnaire responses and watershed studies are specific to the Phase Two Regulation, the data gathering and public outreach efforts are ongoing. According to defendant’s submissions, “EPA has already gathered a great deal of information about existing facilities,” (Cook Deck ¶ 6), much of which it already has used in developing the Phase One rule for new facilities.
 
 (Id.)
 
 Second, defendant contends that the Phase One Regulation will assist it in the preparation of the Phase Two Regulation by addressing important legal concepts such as “adverse environmental impact.” (Fox Deck ¶ 38.) Because the Court finds that the Phase One proposal can be completed earlier than the date proposed by defendant, defendant’s proposed Phase Two date should also be completed earlier. Third, the Court notes that EPA has been focusing for several years on the application of section 316(b) to existing facilities, not only for the 1976 proposed regulation but also in permit proceedings.
 
 See, e.g., In re Public Service Co. of New Hampshire (Seabrook Station, Units 1 and 2),
 
 1977 WL 22370 (E.P.A.);
 
 In re CAROLINA POWER & LIGHT CO. (Brunswick Steam Electric Plant),
 
 1978 WL 18213 (E.P.A.1978). Fourth, EPA has not demonstrated why its projections are justified with regard to the development of the Phase Two Regulation.
 
 (See
 
 Fox Decl. ¶¶ 55-68.) Accordingly, the Court orders that EPA issue the proposed Phase Two Regulation by July 20, 2001, one year following the Phase One proposal.
 

 Either of the deadlines set by the Court above for the proposed Phase One and Phase Two Regulations may be modified
 
 *377
 
 by the parties as part of a further settlement. Further, because of the complexity of the issues involved, the Court refuses at this time to specify the dates for final action on the Phase One and Phase Two Regulations. The Court believes that the parties should continue to negotiate with the purpose of reaching settlement on those deadlines among themselves before July 20, 2000.
 

 V. Appointment of a Special Master
 

 The Court is prepared to appoint a special master in this case if the parties have not agreed on a schedule for final action on the Phase One and Two Regulations by July 20, 2000. The name of the special master under consideration has been disclosed to the parties by the Court, and he has no conflicts that would affect his service to the Court. He has over 25 years of experience in environmental law, with considerable exposure to matters concerning the Clean Water Act and other federal and state environmental statutes. If appointed, the special master would have a limited twofold mandate: (i) to enforce and monitor compliance with the Consent Decree as modified by this order; and (ii) to provide a forum for discussion between the parties regarding settlement of the deadlines for the promulgation of the Phase One and Phase Two Regulations.
 

 Fed. R. Civ. P 58(b) (“Rule 53(b)”) allows the Court to appoint a special master, with charges to be paid by either or both parties. Rule 53(b). Appointing a special master is rare; it is “the exception rather than the rule.”
 
 Id.
 
 In non-jury cases, reference to a master shall be made “only upon a showing that some exceptional condition requires it.”
 
 Id.
 
 Court congestion, delay, and complexity of issues are generally not considered exceptional conditions.
 
 See La Buy v. Howes Leather Co.,
 
 352 U.S. 249, 259, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957).
 

 However, there is considerable room for appointing special masters when the purpose of the master is to enforce a judicial decree.
 
 See Carey, supra,
 
 706 F.2d at 962-65 (upholding decision by the district court appointing a special master to monitor the state government’s compliance with a consent decree designed to protect the constitutional rights of residents at an institution for the mentally retarded);
 
 United States v. Suquamish Indian Tribe,
 
 901 F.2d 772, 774-75 (9th Cir.1990) (upholding decision by the district court to appoint a special master to determine a question of fishing rights);
 
 Nat'l Org. for the Reform of Marijuana Laws v. Mullen,
 
 828 F.2d 536, 542 (9th Cir.1987) (finding that the danger of federal and state governments failing to comply with a Court injunction in a campaign against marijuana planting constituted an “exceptional condition” justifying referral to a special master). There is also considerable authority to support a master’s appointment for the purpose of settlement.
 
 See, e.g., Cook v. McCarron,
 
 1997 WL 47448 (N.D.Ill.) (adopting special master’s findings of fact with respect to the fairness of a settlement agreement he helped to negotiate in class action litigation);
 
 Blackman v. District of Columbia,
 
 185 F.R.D. 4 (D.D.C.1999) (finding that extraordinary circumstances existed to warrant appointment of special master to facilitate resolution of motions for preliminary injunction in class action litigation);
 
 McLendon v. Continental Group, Inc.,
 
 749 F.Supp. 582, 612 (D.N.J.1989) (appointing special master to facilitate settlement of outstanding damages issues in ERISA case).
 

 The Court finds that the requisite “exceptional condition” under Rule 53(b) is present here. The issue in this case is the monitoring of a consent judgment requiring EPA to produce a complex, technical regulation dealing with the operation of thousands of industrial facilities, a regulation which is designed to protect human health and the environment. (Def.’s Mem. at 22-23.) The Court finds that close monitoring is necessary because of the limited progress that has been made thus far in the implementation of the Consent Decree.
 
 *378
 
 The special master would be better positioned than this Court to perform the monitoring necessary to ensure compliance, given his time availability and expertise.
 
 [13]
 

 SO ORDERED.
 

 [1]
 

 . 33 U.S.C. §§ 1251-1387 (1990).
 

 [2]
 

 . All subsequent references to "EPA” or the "Agency” refer to the defendant in this case.
 

 [3]
 

 . The individual utilities and the three organizations are members of the Utility Water Act Group, a group formed for collective participation by the electric utility industry in EPA rulemaking under that Act.
 

 [4]
 

 . Also pending before the Court is a motion by certain electrical utilities and related organizations for leave to intervene. The Court
 
 *366
 
 will address this motion in a subsequent ruling.
 

 [5]
 

 . Section 301 of the Act requires EPA to establish effluent limitations for existing facilities.
 

 [6]
 

 . Section 306 of the Act requires EPA to establish standards of performance for new . facilities, that is, facilities for which construction begins after publication of the Regulation.
 

 [7]
 

 . The Court recognizes that there are significant dangers in sanctioning such flexibility in Consent Decrees. First, plaintiffs seeking to impose time sensitive obligations on defendants will be less likely to enter into a consent decree if defendants can evade the requirements of the decree merely by delaying action and securing modification based on undue hardship.
 
 See Favia v. Ind. Univ. of Pa.,
 
 7 F.3d 332, 341 n. 16 (3d Cir.1993). Second, there is a risk of moral hazard in the general context of consent decree negotiations. If modification were readily available, and the parties relied on the prospective availability of modification when negotiating, the resulting agreement is likely to be less comprehensive and secure than if modification were more difficult to obtain.
 

 [8]
 

 . It is also important to minimize the risk of a challenge to the Regulation by affected entities (e.g. utilities) under the Administrative Procedure Act, which occurred in response to the 1976 proposed regulation and resulted in its eventual withdrawal. (Def.’s Reply at 12.)
 

 [9]
 

 . Executive Order No. 12,866, 58 Fed.Reg. 51,735 (1993), requires a general assessment of the impact of the regulation. The Unfunded Mandates Reform Act (UMRA), 5 U.S.C. § 1501 et seq., requires an assessment of the impact of a regulation on state, local, and tribal governments and the private sector.
 

 [10]
 

 . EPA notes in particular that regulations governing existing facilities require an "empirical baseline” which will be determined by the results of the detailed questionnaire. However, because new facilities have not been created, EPA will rely on projections and assumptions, rather than empirical data, as the basis for its technical, environmental and economic analyses. (Fox Decl. ¶ 39.)
 

 [11]
 

 . Subchapter III of the Clean Water Act itself separates the rules governing existing facilities (section 306) from those governing new facilities (section 301). Moreover, the Act does not specify how the rules governing new and existing facilities should be promulgated, but merely states that they should be promulgated.
 

 [12]
 

 . Proposed intervenors do object. Their objections will be considered in a subsequent decision by the Court.
 

 [13]
 

 . The availability of a magistrate judge may limit the circumstances when appointment of a special master is appropriate.
 
 See Prudential Ins. Co. of America v. United States Gypsum Co.,
 
 991 F.2d 1080, 1086 (3d Cir.1993). The Court considered referring the motion in this case to a magistrate judge. However, given the present dockets of the magistrate judges of this Court, the appointment of a magistrate would delay the adjudication of this action by several months. Since the Court deems this matter to be time sensitive, it must consider other options.